USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/15/10_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MIGUEL DEVISON,                                   :
                                                  :
                        Petitioner,               :          09 Civ. 1031 (DAB) (JLC)
                                                  :
        -v.-                                       :          REPORT AND
                                                  :          RECOMMENDATION
RAYMOND J. CUNNINGHAM,                             :
                                                  :
                        Respondent.               :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Deborah A. Batts, U.S.D.J.:**

Pro se petitioner Miguel Devison ("Petitioner") seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254, challenging his conviction and sentence in the New York State Supreme

Court, New York County, on June 24, 2004. (Petition under 28 U.S.C. § 2254 for Writ of

Habeas Corpus by Person in State Custody dated December 26, 2008 ("Petition" or "Pet."))

(Doc. 1)). A jury convicted Petitioner of Conspiracy in the Second Degree under N.Y. Penal

Law § 105.15 (McKinney 2010) and Criminal Sale of a Controlled Substance in the Third

Degree under N.Y. Penal Law § 220.39. (Id. at 1.) The trial court sentenced Petitioner to

separate consecutive terms of eight to twenty-four, and two to six years, respectively. (Id.)

Petitioner is currently incarcerated at the Woodbourne Correctional Facility in Woodbourne,

New York. (Id.) For the reasons set forth below, I recommend that the Petition be denied in its

entirety.

USDC SDNY
DATE SCANNED___10/15/10_

# I.    BACKGROUND

## A.    The Crime

The trial giving rise to Petitioner's conviction concerned a drug-selling conspiracy that operated primarily out of two adjacent buildings:  550 West 146th Street and 552 West 146th Street in Manhattan.  The conspiracy consisted of two different operations.  Isidro "Montro" Pena headed one operation out of 552 West 146th Street.  (Trial Transcript ("Trial Tr.") at 804-06.)[1]  Miguel "Bolo" Hernandez headed the other operation out of both 550 and 552 West 146th Street.  (Id. at 829, 851-55.)

Although each organization had its own independent structure, the two businesses worked together in various ways.  (Id. at 2114-15.)  For instance, each organization's dealers worked together during the night and agreed on a method to divide customers between the organizations.  (Id. at 2114-15.)  Workers occasionally transferred from one organization to the other.  (Id. at 2117.)  Moreover, "pitchers," those who sold the cocaine from each of the organizations directly to consumers, often communicated with one another.  (Id. at 125, 224.)

Petitioner initially worked under Hernandez.  (Id. at 2116, 2136-37.)  During this period, he worked at 550 West 146th Street and gave instructions to other workers by radio.  (Id. at 2133.)  In January 2001, however, Petitioner began working for Pena.  (Id. at 2137.)  He began as a lookout but later "became [Pena's] right hand."  (Id. at 2138.)  On at least one occasion, Petitioner and another worker were left in charge of Pena's operation while Pena was out of town.  (Id. at 1717-19.)

The police began investigating the drug-selling activity at 550 and 552 West 146th Street

---

[1] The voir dire, trial, and sentencing transcripts have been filed with the Clerk of the Court.  (See Docket Entries Nos. 9-14.)

in September 2002. (Id. at 1527-29.) From observation posts, police detectives watched men with radios direct customers to lines outside the two buildings at 550 and 552 West 146th Street. Customers would give money to the pitchers, and the pitchers would give the customers clear plastic bags or tinfoil packets of cocaine in return. (Id. at 23.)

Police observed Petitioner direct other members of the conspiracy on several occasions. On November 5, 2002, a police detective watched Petitioner, who was standing on the corner of 146th Street and Broadway, speak into a radio when a police car approached. (Id. at 229.) Very shortly thereafter, the doors of both buildings shut closed, and drug buyers fled. (Id. at 230.) Police observed similar sequences of events involving Petitioner "a couple of times." (Id. at 229.)

On April 4, 2003, a detective saw Petitioner on the street with a radio, and the detective intercepted several of Petitioner's broadcasts. (Id. at 1908-13.) At one point, Petitioner transmitted, "Pitcher, pitcher, open the door, open the door" and a man in a ski mask opened the door of 552 West 146th Street. (Id. at 1913.) Subsequently, an undercover police officer went to the door of that building and purchased a tinfoil packet of crack cocaine. (Id. at 980-81.) The detective intercepting Petitioner's transmissions shortly thereafter heard Petitioner shout, "Azul, azul, azul," Spanish for "blue," upon which the pitcher at 552 West 146th Street shut the door to the building. (Id. at 1914-15.) Petitioner went into a nearby store, and police officers arrested him when he emerged. (Id. at 1915-19.)

Five days later, on April 9, 2003, the Police raided the drug-selling operations on 146th Street. (Id. at 61-62.) Police executed 17 search warrants and arrested 31 people related to the organizations that sold drugs from 550 and 552 West 146th Street. (Id. at 62-63.)

**B.**     **Procedural History**

    **1.**     **Trial and Sentencing**

Petitioner was tried with three codefendants:  Effrain Alfonzo, Jose Luis Carlos, and

Guillermo Acevedo.  (Voir Dire Transcript ("Voir Dire Tr.") at 1.)

    On May 25, 2004, a jury in New York State Supreme Court, New York County,

convicted Petitioner of criminal sale of a controlled substance in the third degree.  (Id. at 3491.)

The following day, May 26, the same jury acquitted Petitioner of conspiracy in the first degree

but convicted him of conspiracy in the second degree.  (Id. at 3507.)  The court on June 24, 2004

sentenced Petitioner to consecutive terms of eight to twenty-four years and two to six years,

respectively.  (Sentence Transcript ("Sentence Tr.") at 24.)

    **2.**     **Direct Appeal**

    On appeal to the New York Supreme Court, Appellate Division, First Department (the

"Appellate Division"), Petitioner's assigned counsel argued that the trial court erred by (1)

denying the defense's challenges for cause as to two prospective jurors—one who could not

promise to base her verdict solely on the evidence and another who suggested a bias in favor of

police testimony (Declaration of Thomas B. Litsky in Opposition to Petition for a Writ of Habeas

Corpus dated October 30, 2009 ("Litsky Decl.") Ex. A, at 26-36) (Doc. 15); (2) refusing to

question a juror who, during trial, initiated and had a conversation with a police witness outside

the courtroom (id. at 37-46); (3) refusing to question individual jurors to determine whether they

were tainted by one juror's disclosure that she had been robbed in the course of the trial or by

another juror's possible disclosures of her opinion regarding Petitioner's guilt (id. at 47-59); (4)

refusing to discharge a juror whose aunt lived in the building that Petitioner and his defendant

co-conspirators allegedly controlled and in which they allegedly based their drug-selling operation (id. at 60-67); and (5) denying a requested multiple conspiracies charge (id. at 68-84).

The Appellate Division reached the merits of four of Petitioner's claims that were preserved for review. It first concluded that the trial court properly denied Petitioner's challenges for cause to two prospective jurors, reasoning that neither prospective juror "evinced bias or a state of mind likely to preclude him or her from rendering an impartial verdict based on the evidence adduced at trial." People v. Devison, 38 A.D.3d 203, 204, 831 N.Y.S.2d 64, 65 (1st Dep't 2007). Second, the Appellate Division concluded that the questioning of each individual juror, after a juror told the rest of the jury that she had been robbed during the trial, was not necessary because the incident was not relevant to the evaluation of the evidence, and the trial judge instructed the jury that they could not decide the case based on anything that happened outside of the courtroom. Id. at 205, 831 N.Y.S.2d at 66. Third, the Appellate Division concluded that the trial court properly declined to question individual jurors after a juror, whom the trial court discharged, had been crying hysterically because she had come to an irrevocable opinion about the case prior to its completion. Id. The Appellate Division reasoned that questioning was not necessary because the discharged juror told the court that she did not tell the other jurors about her opinion and the other jurors did not hear her conversation with the court officer about this issue. Id. Finally, the Appellate Division concluded that the trial court properly declined to replace a juror who, after seeing pictures of one of the buildings, realized that her aunt lived in the building. Id., 831 N.Y.S.2d at 65. It reasoned that she did not have any implied bias based on this fact alone as she had not been to her aunt's home in months, promised not to go there during the trial, and stated unequivocally that she had formed no opinion about the case based on her aunt's connection to the building. Id., 831 N.Y.S.2d at 66.

As to Petitioner's other claims, the Appellate Division concluded that they were both unpreserved and without merit. It first found that the trial court properly declined to question the sworn juror who talked to a key prosecution witness because they spoke of trivial matters and no other jurors were present during the conversation. Id. at 204, 831 N.Y.S.2d at 65-66. Next, it declined to review Petitioner's contention that the juror who had an aunt living in one of the buildings at issue in the case should have been replaced based on her and her aunt's "consanguinity," but went on to state that the contention was without merit as the aunt was not someone who had been injured by the crime charged. Id. at 205, 831 N.Y.S.2d at 66. Next, the Appellate Division concluded that the trial court properly declined to give the jury a multiple conspiracies charge, even though Petitioner argued that the drug-selling operations in the two adjoining buildings could be considered separate conspiracies. Id. The Appellate Division based this decision on the reasons it stated in its decision regarding codefendant Alfonzo's appeal,[2] and further concluded that Petitioner's other arguments on this issue were without merit. Id. at 205-6, 831 N.Y.S.2d 66. Therefore, the Appellate Division affirmed Petitioner's convictions on March 1, 2007. Devison, 38 A.D.3d at 204, 831 N.Y.S.2d at 65.

Petitioner filed for leave to appeal to the New York Court of Appeals, which was denied on June 7, 2007. People v. Devison, 872 N.E.2d 882, 840 N.Y.S.2d 769 (2007).

### 3.   Collateral Attack

On November 8, 2007, Petitioner filed a Motion to Vacate the Judgment pursuant to N.Y. C .P. L. § 440.10 with a supporting affidavit. (Litsky Decl. Ex. H, at 34-74 (Doc. 15).) Petitioner contended his right to a fair trial and an impartial jury had been violated because the

---

[2]  In People v. Alfonso, 35 A.D.3d 269, 269, 827 N.Y.S.2d 39, 39-40 (1st Dep't 2006), the Appellate Division concluded that the evidence, viewed most favorably to the defendants, could not support a multiple conspiracies charge as the drug operations in the adjoining buildings "were so closely linked that they could only be viewed as a single conspiracy."

trial court failed to (1) conduct an inquiry of a sworn juror who spoke with a lead police witness during trial; or (2) dismiss a juror whose aunt lived in the building where the conspiracy allegedly took place. (Id. at 38.) Petitioner also contended that he was denied effective assistance of counsel when his defense counsel failed to (a) request that the trial court conduct an inquiry of a sworn juror who spoke with a lead police witness, (b) move the trial court to remove a sworn juror whose aunt lived in the building where the alleged conspiracy occurred, and (c) protect and preserve the defendant's right to appeal by making proper motions and timely objections. (Id.)

The trial court denied Petitioner's motion on July 29, 2008 based on "the reasons set forth in the People's response." (Id. at 32.)  Petitioner then filed an Application for a Certificate Granting Leave to Appeal the New York Supreme Court's decision denying his Motion to Vacate the Judgment on September 6, 2008. (Id. at 1-2.)  On November 5, 2008, Petitioner's Application for a Certificate Granting Leave to Appeal was denied. (Litsky Decl. Ex. J. (Doc. 15).)

### 4.   Habeas Petition

Having properly exhausted his state law remedies with respect to each of his claims,[3] Petitioner timely filed his Petition on December 26, 2008. (Pet. at 1 (Doc. 1).)[4]  In his Petition,

---

[3]  It is undisputed that Petitioner has properly exhausted all of his claims by fairly presenting the federal constitutional nature of the claims to each available level of the state courts. (See Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Resp.'s Opp'n") at 26 (Doc. 16)); see generally Daye v. Attorney Gen., 696 F.2d 186, 190-94 (2d Cir. 1982).

[4]  Although the habeas corpus petition was filed with the Court on February 5, 2009, because Petitioner is pro se, he benefits from the "prison mailbox rule," which provides that a petition is deemed filed on the day it is handed to the prison officials for mailing. Houston v. Lack, 487 U.S. 266, 276 (1988). Petitioner signed and dated the Petition on December 26, 2008; I will thus assume for purposes of this Report and Recommendation that this is the date that Petitioner handed his petition to the prison officials for mailing.

Petitioner reiterates the same claims he presented to the Appellate Division and, in his § 440.10 motion, the trial court—that his constitutional rights were violated when (1) the trial court denied the defense's challenges for cause where one prospective juror could not promise to base her verdict solely on the evidence and another juror indicated a bias in favor of police testimony; (2) the trial court refused to question a juror who, during trial, spoke with a "crucial police witness" outside the courtroom; (3) the trial court refused to conduct individual inquiries of the jurors to determine whether they were tainted by one juror's disclosure that she had been robbed in the course of the trial or by another juror's possible disclosure regarding Petitioner's guilt; (4) the trial court refused to discharge a juror whose aunt lived in a building in which the Petitioner and his codefendants based their drug-selling operation; (5) the trial court denied a requested multiple conspiracies charge; and (6) Petitioner's trial counsel, due to his ineffectiveness, failed to make timely objections and motions for the trial court to (a) conduct an inquiry of a sworn juror who spoke with the lead prosecution witness during trial, and (b) remove a sworn juror who was related within the sixth degree to a person that lived in the building where the alleged conspiracy had occurred.  (Id. at 9.)

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   AEDPA Standard of Review

When a state court has adjudicated a federal constitutional claim on the merits,[5] "[u]nder the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal

---

[5] A claim is considered to have been "adjudicated on the merits" when a court has rendered "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).

law, as determined by the Supreme Court of the United States.'" Knowles v. Mirzayance, —

U.S. —, 129 S. Ct. 1411, 1418 (2009) (quoting 28 U.S.C. § 2254(d)(1)).  Accordingly, the only

source of clearly established Federal law that a federal court may consider in reviewing a state

prisoner's habeas application are the decisions of the Supreme Court.  Williams v. Taylor, 529

U.S. 362, 412 (2000).  Moreover, a federal court reviewing a habeas application need only

consider "the holdings, as opposed to the dicta, of th[e] Supreme Court's decisions as of the time

of the relevant state-court decision."  Id.

  A state court decision is "contrary to" clearly established law under the first clause of §

2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme

Court] on a question of law or if the state court decides a case differently than [the Supreme

Court] has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13.

  A state court decision involves an "unreasonable application" of clearly established law

under the second clause of § 2254(d)(1) "if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

facts of the prisoner's case."  Williams, 529 U.S. at 413.  Additionally, a state court may

unreasonably apply Supreme Court precedent "if the state court unreasonably extends a legal

rule established by the Supreme Court or if it unreasonably fails to extend a legal rule to a

context in which the rule reasonably should apply."  Serrano v. Fischer, 412 F.3d 292, 296-97

(2d Cir. 2005) (citation omitted).

  The Supreme Court "ha[s] explained that 'an unreasonable application of federal law is

different from an incorrect application of federal law.'"  Renrico v. Lett, — U.S. —, 130 S. Ct.

1855, 1862 (2010) (quoting Williams, 529 U.S. at 410).  "'[A] federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly." Id. (quoting Williams, 529 U.S. at 411).  Instead, "that application must be 'objectively unreasonable.'" Id. (quoting Williams, 529 U.S at 409).  Thus, the "'petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.'" Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010) (quoting Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003)).

**B.      Procedural Bar**

"It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, — U.S. —, 129 S. Ct. 1769, 1780 (2009) (quoting Coleman v. Thompson, 501 U. S. 722, 729 (1991)); Lee v. Kemna, 534 U. S. 362, 375 (2002).  The doctrine is designed to "'ensur[e] that the States' interest in correcting their own mistakes is respected in all federal habeas cases.'" Cone, 129 S. Ct. at 1780 (quoting Coleman, 501 U. S. at 732).  The Supreme Court thus "ha[s] held that when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." Id. (citing Coleman, 501 U.S. at 732).

**1.      Independence**

Generally, in order to determine whether the state law ground upon which a petitioner relies is independent, reliance on the state procedural rule must be "clear from the face of the opinion." Coleman, 501 U.S. at 735; see also Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000); Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

10

If the state court decision states that a claim is procedurally barred, but reaches the merits in the alternative, habeas review is inappropriate.  Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); Glenn, 98 F.3d at 724.  However, if the state court decision contains ambiguous language such as "the claims are either unpreserved or without merit," the claims are subject to federal court habeas review.  Deberry v. Portundo, 403 F.3d 57, 64 (2d Cir. 2005) (emphasis added) (citing Fama, 235 F.3d at 811).

### 2. Adequacy

To be deemed adequate,  the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state in question, Ford v. Georgia, 498 U.S. 411, 423-24 (1991), and that it has not been "misapplied in [the petitioner's] case in particular."  Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citations omitted); see also Clark v. Perez, 510 F.3d 382, 391 (2d Cir. 2008); Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007).  Moreover, even if a state rule is discretionary, it can serve as an adequate and independent state law ground.  Beard v. Kindler, — U.S.—, 130 S. Ct. 612, 618 (2009).

In certain limited circumstances, however, even state rules that are firmly established and regularly followed will not foreclose review of a federal claim where the particular application of the rule is "exorbitant."  Lee, 534 U.S. at 376. The Supreme Court in Lee determined that the application of a firmly established and regularly followed state procedural rule would be exorbitant based on three considerations.  Id. at 381.  The Second Circuit adopted and summarized these considerations as a three-part test in Cotto v. Herbert.  331 F.3d at 240.  These three considerations are not dispositive for determining adequacy, but serve as guidelines in evaluating "the state interest in a procedural rule against the circumstances of a particular case."

Garvey, 485 F.3d at 714 (citing Lee, 534 U.S. at 381-85). The three factors are

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state case law indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Cotto, 331 F.3d at 240.

### 3.    Exceptions—Cause, Prejudice, and Miscarriage of Justice

A petitioner who has procedurally defaulted is not entitled to habeas review of his claim, unless he can demonstrate either (1) cause for the default and actual prejudice, or (2) that failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50. To show cause, a petitioner must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). A petitioner suffers actual prejudice when the outcome of the case would likely have been different but for the alleged constitutional violation. See, e.g., Reed v. Ross, 468 U.S. 1, 12 (1984); Collins v. Artus, No. 08 Civ. 1936 (PKC) (JCF), 2009 WL 2633636, at *8 (S.D.N.Y. Aug. 26, 2009). Even absent a showing of cause and prejudice, a petitioner's claim may be entitled to habeas review if he can show that denying review would result in a "fundamental miscarriage of justice;" in such instances, a court may only grant relief in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 495-96.

### C.    Interpretation of Pro Se Submissions

Finally, I note that Petitioner is proceeding pro se, and therefore his submissions "'must

12

be held to less stringent standards than formal pleadings drafted by lawyers.'" Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)); see also Seidemann v. Bowen, 584 F.3d 104, 118 (2d. Cir. 2009). Additionally, the Court must liberally construe the pleadings and interpret them "'to raise the strongest arguments that they suggest.'" Diaz v. United States, 517 F.3d 608, 613 (2d Cir. 2008) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Pro se status, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (citation and internal quotation marks omitted).

## III.   DISCUSSION

### A.   Denial of For-Cause Challenges Claim

Petitioner asserts that he was deprived of due process and his right to an impartial jury by the trial court's denial of two of his for-cause challenges to two prospective jurors—Maria Vasquez ("Vasquez") and John Davin ("Davin").[6] (Pet. at 9 (Doc. 1).) Defense counsels ultimately struck both prospective jurors with peremptory challenges. (Voir Dire Tr. at 271, 386.) The Appellate Division concluded that the trial court "properly denied defendant's

---

[6] Petitioner does not identify the jurors by name; however, Vasquez is identified as Prospective Juror #3, and Davin is identified as Prospective Juror # 10.  Petitioner contends that Vasquez did not agree to base her verdict solely on the evidence presented at trial. (Pet. at 9 (Doc. 1).)  The Voir Dire Transcript reflects, however, that Vasquez agreed to do so. (Voir Dire Tr. at 237.)  Indeed, in response to a question from Petitioner's counsel whether she could be able to vote not guilty if the prosecution does not meet its burden, (id. at 235-37), Vasquez states that "I'll just go by the evidence that is presented; that is in front of me" (id. at 237).  Moreover, shortly thereafter, Petitioner's counsel asked Vasquez, "Do you understand if you have opinions, they would need to be based on the evidence that was presented here?" (Id.)  Vasquez unequivocally answered "[y]es" to that question. (Id.)

Petitioner contends that Davin exhibited a pro-police bias.  The transcript, however, indicates that Davin merely expressed the idea that police can fabricate testimony but that it is "not their purpose in general" to do so. (Id. at 354.)  The trial court denied Petitioner's counsel's for-cause challenge to Vasquez and a codefendant counsel's for-cause challenge to Davin. (Id. at 265, 375-76.)

challenges for cause to two prospective jurors." <u>Devison</u>, 38 A.D. at 204, 831 N.Y.S.2d at 64.

Respondent contends that this claim is not cognizable on habeas review. (Resp.'s Opp'n at 32.) I agree. The Sixth Amendment, which is made applicable to the States by the Fourteenth Amendment, guarantees a criminal defendant the right to trial by an impartial jury. <u>Duncan v. Louisiana</u>, 391 U.S. 145, 159 (1968). The Supreme Court has concluded, however, that no due process violation occurs when a trial court refuses to excuse a juror for cause and the defendant chooses to use a peremptory challenge against that juror. <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 315-16 (2000); <u>Ross v. Oklahoma</u>, 487 U.S. 81, 88 (1988). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." <u>Ross</u>, 487 U.S. at 88. Indeed, the Supreme Court, in <u>United States v. Skilling</u>, recently reiterated that "if [a] defendant elects to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, we have held, he has not been deprived of any . . . constitutional right." — U.S. —, 130 S. Ct. 2896, 2922 n.1 (2010) (citation and internal quotation marks omitted). Accordingly, to assert a cognizable claim on this ground, Petitioner must establish that the jury that convicted him was not impartial. <u>United States v. Rubin</u>, 37 F.3d 49, 54 (1994) (citing <u>United States v. Towne</u>, 870 F.2d 880, 885 (2d Cir. 1989)).

Here, after the trial court denied Petitioner's challenges for cause regarding Vasquez and Davin, Petitioner's counsel and the counsel of a co-defendant exercised their peremptory challenges to remove them from the venire. (Voir Dire Tr. at 271, 386.) Petitioner, moreover, has not established that the jury eventually empanelled was not impartial. <u>See</u> <u>Skilling</u>, 130 S. Ct. at 2923-25. Accordingly, Petitioner is not entitled to habeas corpus relief based on this claim.

### B.     Jury Misconduct Claims

Petitioner next asserts that the trial court denied him a fair and impartial jury on three separate grounds—by (1) not questioning juror Ferdinand Rivera ("Rivera") about his conversation with Detective Richard Canelo ("Canelo"), a key government witness, outside the courtroom; (2) declining to discharge juror Marla Montalvo ("Montalvo") when she informed the court that her aunt lived in a building involved in the case; and (3) declining to question juror Yoiata Ehe ("Ehe") after she disclosed that she had been robbed during the course of the trial, or juror Andrea Scheuer ("Scheuer") after she informed the court that she had formed an irrevocable opinion about the defendants' guilt or non-guilt and was therefore discharged. (Pet. at 9 (Doc. 1).)

Petitioner's first claim is procedurally barred and his second and third claims are meritless.

### 1.     Juror Ferdinand Rivera

#### a.     Background

After opening statements, Detective Canelo informed the court, outside of the presence of the jury, that he had spoken with juror Ferdinand Rivera in the hallway earlier in the day. (Trial Tr. at 5.) From the transcript, it appears that Rivera initially believed Canelo to be another juror. (Id.) Rivera remarked that Canelo "wasn't here yesterday," to which Canelo responded that he was "a detective on one of the cases." (Id.) Rivera then "said something about the trains being delayed; about the weather." (Id.) Rivera said he was a paramedic and asked where Canelo worked. (Id.) Canelo told him he worked in Washington Heights, and the conversation ended. (Id.) No other jurors were present, and the conversation did not touch on the case. (Id.) Canelo did not know that Rivera was a juror. (Id. at 6)

15

The counsel of codefendant Carlos asked the trial court to question Rivera about the conversation, but the trial court declined to do so, reasoning that it did not "like singling out jurors" and that it was "satisfied on this record that nothing untoward happened.  There was no discussion about the case." (Id.)  Carlos's counsel then requested that the court remove Rivera from the jury, arguing that Rivera was "ingratiating himself with the detective." (Id. at 7.)  The court declined, pointing out that Canelo had not told Rivera that both men were involved with the same case. (Id.)

Petitioner's counsel asserted that Rivera would recognize Canelo when Canelo testified and would have formed an opinion about Canelo's credibility based on the fact that "[t]hey had his very friendly, lovely conversation." (Id.)  The prosecutor responded that Rivera and Canelo had a "one-way conversation" that would not have allowed Rivera to form an opinion about Canelo. (Id. at 8.)  The counsel of codefendant Acevedo reiterated the earlier motion to question Rivera. (Id.)  The court again declined to do so. (Id.)

**b.    Independent and Adequate State Grounds**

Federal habeas review of a claim is barred when "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on [an independent and adequate] state procedural bar . . . ." Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996) (citing Harris v. Reed, 489 U.S. 255, 263 (1989)); accord Coleman, 501 U.S. at 750; Richardson v. Greene, 497 F.3d 212 (2d Cir. 2007).

Here, as the Appellate Division concluded, Petitioner's constitutional arguments regarding the trial court's determination concerning Rivera were not preserved for appellate review because Petitioner's counsel never lodged an objection based on federal constitutional grounds. See People v. Devison, 38 A.D.3d at 204, 831 N.Y.S.2d at 64.  Indeed, Petitioner's

counsel's objections were general and did not specifically assert a federal constitutional basis for the objections. (See Trial Tr. at 5-7.)

New York Criminal Procedure Law § 470.05 preserves for review "'only those questions of law as to which 'a protest . . . was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.'" Garcia v. Lewis, 188 F.3d 71, 78 (2d Cir. 1999) (quoting N.Y. C.P.L. § 470.05). The Second Circuit has consistently recognized § 470.05 as an independent and adequate state procedural bar. See id. at 79 ("[W]e have observed and deferred to New York's consistent application of its contemporaneous objection rules.") (citing Bossett v. Walker, 41 F.3d 825, 829 n.2 (2d Cir. 1994)); see also Garvey v. Duncan, 485 F.3d 709, 720 (2d Cir. 2007).

Because Petitioner's constitutional claim was unpreserved for state appellate review, it is procedurally barred. See, e.g., Garcia, 188 F.3d at 82 (concluding that petitioner's claim was procedurally barred where state appellate court ruled claim unpreserved for review). Thus, the remaining question is whether the Appellate Division's application of the rule to the Petitioner's case was reasonable, and not "exorbitant." See Garvey, 485 F.3d at 718. This requires an analysis of the Cotto factors.

> ### i.   Was the alleged violation actually relied on at trial, and would perfect compliance have changed the trial court's decision?

Regarding the first Cotto factor, the question of whether the trial judge "actually relied on" the procedural default "is less applicable in this case because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court." Cotto, 331 F.3d at 242. Moreover, the issue of "whether perfect compliance would have changed the outcome, 'is less relevant' in evaluating the failure to preserve a claim." Stewart v. Greene, No. 05 Civ. 0566

(WHP) (THK), 2009 WL 4030833, at *15 (S.D.N.Y. Nov. 19, 2009) (quoting Ashley v. Burge,

No. 05 Civ. 4497 (JGK), 2006 WL 3327589, at *5 (S.D.N.Y. Nov. 3, 2006). As noted by the

Second Circuit in Cotto, "the likely impact of a timely objection involves a certain degree of

speculation." Cotto, 331 F.3d at 243; see also Donaldson v. Ercole, No. 06-5781-pr, 2009 WL

82716, at *2 (2d Cir. Jan. 14, 2009) (summary order). The first Cotto factor, therefore, does not

suggest that application of the rule was exorbitant.

### ii.     Did New York State case law indicate that compliance with the rule was demanded in the present case?

Regarding the second Cotto factor, New York courts consistently require compliance

with the contemporaneous objection rule, except in unique circumstances. See, e.g., People v.

Hicks, 6 N.Y.3d 737, 739, 843 N.E.2d 1136, 1138 (2005) (concluding that defendant's

contention that trial court failed to conduct probing inquiry of allegedly biased juror was

unpreserved in absence of protest to scope or intensity of court's inquiry of juror) (citing C.P.L.

470.05(2)); People v. Dandridge, 45 A.D.3d 330, 331, 845 N.Y.S.2d 55, 57 (1st Dep't 2005)

(rejecting as unpreserved defendant's claim that trial court failed to make additional inquiry of

juror when defendant failed to object to inquiry that trial court made or request additional

inquiry).

In Lee, the Supreme Court explained that "in the 'unique circumstances' presented, that

is, 'the sudden, unanticipated, and at the time unexplained disappearance of critical, subpoenaed

witnesses on what became the trial's last day,' the state courts had never before applied the state

rule in question." Garvey, 485 F.3d at 719 (quoting Lee, 534 U.S. at 382). In Garvey, however,

the Second Circuit found no such circumstances. There, the defendant did not provide the trial

court with a fair opportunity to consider the constitutional issue of whether a civilian-facilitated

identification was suggestive and needed to be suppressed. Id. at 715-16. The defense's

18

noncompliance with C.P.L. § 470.05(2) was the result of defense counsel making only a declaration that the identification was suggestive, which was considered insufficient under the contemporaneous objection rule, and not due to any unique circumstances mitigating the need for compliance. Id. at 719. Like Garvey, this case presents no unique set of circumstances similar to those in Lee that led to Petitioner's noncompliance. See Garvey, 485 F.3d at 719. Since there was no "sudden, unanticipated event" that caused Petitioner's failure to comply with C.P.L. § 470.05(2), the second consideration does not suggest that application of the Rule was exorbitant. Garvey, 485 F.3d at 719; Lee, 534 U.S. at 382.

### iii.  Would demanding perfect compliance with the contemporaneous objection rule serve a legitimate governmental interest?

Finally, Petitioner did not "substantially comply" with the contemporaneous objection rule. The Second Circuit has recognized that demanding compliance with C.P.L. § 470.05 serves a legitimate governmental interest—"the interest in allowing the trial court to have the first opportunity to rule on and possibly rectify any alleged legal error." Garvey, 485 F.3d at 720. While Petitioner's counsel did put the trial court on notice regarding his belief that the court should question Rivera regarding his conversation with Detective Canelo, Petitioner's counsel's omission of any federal dimension in his comments to the court hindered the furtherance of the court's legitimate governmental interest in requiring compliance with the rule. The third consideration thus does not suggest that the Appellate Division's application of C.P.L. § 470.05 was exorbitant.

Consequently, because the Appellate Division's decision was based on a ground independent of any federal question and adequate under firmly established and regularly followed state law, Petitioner's claim that the trial court's refusal to question Rivera violated his

19

federal constitutional rights is procedurally barred.

### c.      Cause and Prejudice, or Fundamental Miscarriage of Justice

Petitioner cannot overcome this procedural bar because he has not established cause for his procedural default.  "[T]he cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court."  McClesky v. Zant, 499 U.S. 467, 493 (1991) (quoting Murray, 477 U.S. at 488); accord Bloomer v. United States, 162 F.3d 187, 191 (2d Cir. 1998).  Petitioner has identified no such objective factor external to the defense.[7]  Because Petitioner has not demonstrated cause for his procedural default, the Court need not address the issue of prejudice.  See McCleskey, 499 U.S. at 502; Acosta v. Giambruno, 326 F. Supp. 2d 513, 520 (S.D.N.Y. 2004).

Finally, Petitioner makes no showing that failure to consider the claim would result in a fundamental miscarriage of justice; he points to no evidence to suggest that he is actually innocent, and would have struggled to do so in the face of the substantial evidence adduced at trial demonstrating his guilt.  See Murray, 477 U.S. at 495-96.  Accordingly, Petitioner is unable to overcome the procedural bar of his claim that the trial court's refusal to question Rivera violated his federal constitutional rights.

### 2.      Jurors Yoiata Ehe and Andrea Scheuer

#### a.      Background

On the morning of May 3, 2004, at the approximate midpoint of the trial, the court announced that juror Yoiata Ehe had telephoned the court, reporting that she had been robbed that morning.  (Trial Tr. at 1627-28.)  After a recess, codefendant Carlos's counsel asked that

---

[7] Although Petitioner asserts that his counsel's failure to move for the trial court to question Rivera constitutes ineffective assistance of counsel—a recognized "objective factor external to the defense," see Murray, 477 U.S. at 488—as discussed in Part III.D.2. infra, Petitioner's counsel was not constitutionally ineffective.

the court remove Ehe from the jury, arguing that her experience being robbed might prevent her from being fair. (Id. at 1632.) Codefendant Alfonzo's attorney joined the application and asked in the alternative that the trial court question Ehe about the events of that morning. (Id.) Petitioner's counsel neither made nor joined any request regarding juror Ehe.

The court responded that Ehe would bring any "problem" to the court's attention and that the court would not question her unless Ehe did so. (Id. at 1633.) Petitioner's counsel and Alfonzo's counsel objected that individual jurors might not in fact bring their problems to the court, but the court responded that "the jurors are capable of letting [the court] know if they want to speak to [the court]." (Id.) In the end, the court decided not to rule on the issue at that time. (Id. at 1634.)

After the lunch recess that day, Carlos's counsel informed the trial court that he saw Ehe, in the hallway, telling other jurors about her robbery. (Id. at 1697.) Carlos's counsel asked for a mistrial and renewed his request that the court remove or question Ehe. (Id.) Alfonzo's counsel reported seeing Ehe tell "five to eight other jurors" what had happened to her and that the other jurors "were visibly reacting to this in an emotional way." (Id.) Ehe "looked very upset." (Id. at 1698.) Alfonzo's counsel requested that the court question Ehe, and Carlos's counsel renewed his request for a mistrial, arguing that "all the other jurors ha[d] been tainted." (Id. at 1698-99.)

After this discussion, the court called in the jury. The court drew attention to Ehe's lateness that morning and stated that it did not "know what she told you or didn't tell you." (Id. at 1699.) The court reminded the jurors "that anything that occurs outside the courtroom is not evidence." (Id.) Further, the court stated that it trusted that the jurors were "still following [the court's] instructions" and reiterated that "you must decide the case strictly on the evidence that has to do with this trial" and that "anything that occurs outside the juryroom [sic] is not evidence

21

and must not affect your ability." (Id. at 1699-1700.) The court concluded by stating its assumption that, unless a juror informed the court otherwise, "everyone . . . can be fair jurors, and decide this case strictly on the evidence, and under the law." (Id. at 1700.)

The following day, May 4, the court called in juror Ehe in order to "see if she [was] all right and find out exactly what happened." (Id. at 1771.) Ehe stated that her attacker "grabbed [her] from behind" and took her purse. (Id.) She reported the incident to the police but "didn't get to see [the attacker's] face." (Id. at 1773.) The court next asked whether Ehe could be "fair to both sides," and Ehe responded that she could. (Id. at 1772.)

The next morning, May 5, a court officer presented the court with a note from Ehe's doctor prescribing bed rest for Ehe. (Id. at 1984.) With the consent of the parties, the court excused Ehe, replacing her with alternate juror Andrea Scheuer. (Id. at 1985.) Codefendant Carlos's counsel renewed his application for a mistrial, requesting in the alternative that the court question the individual jurors about what Ehe had told them. (Id. at 1986.) The court denied both requests. (Id.)

The following day, May 6, a court officer informed the court that Scheuer was "crying hysterically" and had "already formed an opinion about the case." (Id. at 2239.) The court noted that Scheuer was "pretty displeased" about taking Ehe's place on the jury and losing "her seat next to juror number six," which appeared "very important to her." (Id. at 2240.) The court called in Scheuer, who, outside the presence of the other jurors, verified that she had formed an opinion about the defendants. (Id. at 2241.) She stated that she did not feel that anything would change her opinion and that she did not believe she could continue. (Id. at 2242.) Scheuer also told the court that she had not discussed her opinion with other jurors or alternate jurors. (Id.)

Scheuer left the courtroom, and codefendant Acevedo's counsel moved for a mistrial,

arguing that Scheuer had been "carrying on" with other jurors. (Id. at 2245.) Codefendant Alfonzo's counsel joined the motion, referring to Scheuer's "flirtatious behavior" with juror number six. (Id. at 2246.) Alfonzo's counsel claimed that Scheuer had not been honest with the court and "possibly . . . could have told another juror, especially since she had a relationship with one." (Id. at 2246-47.) The court denied the motion, calling Alfonzo's counsel's argument "speculation." (Id. at 2247.) Alfonzo's counsel requested that the Court question the jurors individually, but the court declined to do so, though it stated that it would consider a curative instruction. (Id. at 2247.) The court discharged Scheuer, replacing her with an alternate juror, and it warned Scheuer not to contact any juror or alternate juror until after the verdict. (Id. at 2248.) When the jury returned, the court told the jurors they were "not to speculate as to the reasons or anything to do with the substitution." (Id. at 2249.)

### b.     The Merits—Jury Misconduct

Petitioner contends the trial court erroneously failed to question the jury both after juror Ehe told some jurors that she had been robbed, and after juror Scheuer told the court that she had formed an opinion about the defendants' guilt or non-guilt, thus depriving Petitioner of his right to a fair and impartial jury. (Pet. at 9 (Doc. 1).)

Regarding Ehe, the Appellate Division concluded that "[t]he court properly declined to question each juror individually about what another juror had said about having been robbed." Devison, 38 A.D.3d at 205. The Appellate Division reasoned that "the incident had nothing to do with the jury's evaluation of the evidence, and the court's instruction to the entire panel, that nothing outside the courtroom was evidence and that the case must be decided solely on the evidence, was sufficient to address any possible prejudice, especially since the case did not involve robbery or any related crime." Id.

23

Similarly, the Appellate Division concluded that the trial court properly declined to question the jurors regarding Scheuer. Id. The Appellate Division reasoned that she "stated that she had not spoken to any other jurors about her opinion, and that her conversation with the court officer was not overheard." Id. Moreover, the court reasoned, "there was nothing in the record to indicate that the juror had spoken to any other juror about this matter and there is no reason to disturb the court's credibility determination regarding the juror's statement." Id.

The question presented is thus whether the Appellate Division's conclusions regarding Ehe and Scheuer constitute an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

I conclude that they do not. There is no Supreme Court precedent that would have required the trial judge to question the jury in this case. Though the right to an impartial jury requires the trial judge to investigate external jury coercion, see Remmer v. United States, 347 U.S. 227, 229-30 (1954), reviewing courts are deferential to trial judges' decisions with respect to handling intra-juror misconduct allegations because trial courts "face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial." United States v. Thomas, 116 F.3d 606, 618 (2d Cir. 1997). Moreover, "[i]ntra-jury communications pose a less serious threat to a defendant's right to an impartial trial than do extra-jury influences, and therefore [trial] courts are entitled to even greater deference in their responses to them than in responses to outside influences." United States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003) (citation and internal quotations omitted). Finally, the Second Circuit requires that "[o]n § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial." Fama, 235 F.3d at 813. After all, the trial court "which observ[es] the jury on a day to day basis . . . is in the best position to sense the

24

atmosphere of the courtroom as no appellate court can on a printed record." United States v. Abrams, 137 F.3d 704, 708 (2d Cir. 1998) (citation and internal quotation marks omitted). Thus, "[i]n many instances, the court's reiteration of its cautionary instructions to the jury is all that is necessary." Id. (quoting United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994)); cf. Skilling, 130 S. Ct. at 2925 ("Jurors, . . . , need not enter the box with empty heads in order to determine the facts impartially. 'It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court.'" (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961))).

That is exactly what happened here. After learning of Ehe's conversation with the other jurors, the court delivered a cautionary instruction, reminding the jury that anything that occurs outside the courtroom is not evidence, and that they "must decide the case strictly on the evidence that has to do with th[e] trial." (Tr. at 1699-1700.) The court, moreover, informed the jury that if any juror no longer felt he or she could decide the case based on the evidence, that he or she should let the judge know. (Id. at 1700.) The court thus took sufficient steps to ensure that the jury was not biased by any conversations that its members might have had with Ehe. Petitioner has produced no evidence tending to overcome the strong presumption of correctness that this Court applies to the trial court's determination that the jury was impartial, and the trial court did not deprive Petitioner of a trial by an impartial jury by refusing to question the jurors individually following Ehe's discussion with them about her robbery.

The same applies to the trial court's determination that it was unnecessary to question individual jurors in relation to Scheuer's emotional display and subsequent discharge. The court took sufficient steps to ensure that the jury was impartial by questioning Scheuer and confirming that she had not discussed the opinion she had formed with other seated or alternate jurors.

25

(Trial Tr. at 2241-42.)  Moreover, the court was careful to instruct the jury that it was "not to speculate as to the reasons or anything to do with the substitution."  (Id. at 2249.)

There is no clearly established law of the Supreme Court that would have compelled the trial court to question the jury in circumstances such as these.  Petitioner's claims in this regard are therefore meritless.

### 3.    Juror Marla Montalvo

#### a.    Background

At the end of the day on April 15, 2004, after the government's first witness concluded his testimony and after the jury had left the courtroom, a court officer reported that juror Marla Montalvo had told the officer that her aunt lived at 552 West 146th Street, one of the buildings in which Petitioner and his codefendants worked.  (Id. at 80.)  The officer stated that she only realized her aunt lived in a building involved in the case when she "watched the building," presumably on a video introduced into evidence.  (Id.)  The court recalled Montalvo.  In response to the court's questions, Montalvo stated that she had visited her aunt at 552 West 146th Street, but that she had not done so since September or October 2003, six or seven months before Petitioner's trial, when she went in "for two seconds."  (Id. at 81.)  Montalvo assured the court that she would not visit the building for the duration of the trial and that she did not know any of the defendants or witnesses in the case.  (Id. at 81-82.)  Further, she agreed that she had formed no opinion about the case based on her visits to the building and that she had not discussed the matter with any other jurors, after which she exited the courtroom.  (Id. at 82.)

After Montalvo departed, Petitioner's counsel stated, "Judge, we have an—" but was interrupted by codefendant Alfonzo's counsel before he could continue.  (Id. at 82.)  Alfonzo's counsel requested that Montalvo be replaced by an alternate juror, arguing that counsel would

not have selected a juror with a relative in 550 or 552 West 146th Street. (Id. at 82-83.) Codefendant Carlos's counsel declared his concern to be "what [Montalvo had] been told by her aunt, [and] what she's heard about the building." (Id. at 84.) Codefendant Acevedo's counsel was concerned that Montalvo had not disclosed the place of her aunt's residence during voir dire. (Id. at 85-86.) After his initial interrupted statement, Petitioner's counsel was silent during this exchange.[8]

The court declined to replace Montalvo with an alternate juror. (Id. at 86.) It noted that Montalvo had not intentionally withheld information during voir dire but had only realized that her aunt lived in a building involved in the case when she saw an image of the building during the trial. (Id. at 84.) After declining to remove Montalvo, the court adjourned. (Id. at 87.)

The court next convened on April 19. Codefendant Carlos's counsel then renewed the motion to have Montalvo removed from the jury. (Id. at 94.) He reported that a defendant's family member who had been observing the trial had "recognized [Montalvo] from 146th Street." (Id.) He further stated that Montalvo's aunt had "had confrontations with members of the Acevedo family" and that "it's believed that . . . [Montalvo's aunt] filed complaints with the 30th Precinct about what was going on, on that block." (Id.) Alfonzo's counsel asked for a hearing because Montalvo's aunt "may have had a conversation about her complaints, about her living situation with [Montalvo]." (Id. at 97.) Petitioner's attorney took no part in this exchange.

The court denied both the motion to remove Montalvo and the motion for a hearing. (Id.) It stated that it did not consider the family member's alleged recognition of Montalvo to be "credible or relevant or probative," reiterating that Montalvo had, in response to the court's

---

[8] It thus appears from the transcript that Petitioner's claim was not preserved for review before the Appellate Division. See C.P.L. § 470.05. Since the Appellate Division found the claim preserved, however, I must nevertheless address its merits.

questioning, stated that she knew nothing about the case or any name involved with it. (Id. at 95.) If a relative of a defendant could disqualify a juror simply by claiming to recognize her, the court reasoned, a relative would be likely to make such a claim if he felt the trial was progressing in a direction contrary to his wishes. (Id.) The court further dismissed Alfonzo's counsel's suggestion that Montalvo and her aunt discussed the drug dealing at 550 and 552 West 146th Street as "speculation." (Id. at 97.) The Appellate Division affirmed the trial court's decision, reasoning that "the juror did not have implied bias based on th[e] remote fact" that her aunt lived in one of the buildings in which the drug dealing occurred. Devison, 831 N.Y.S.2d 64, 64-65, 38 A.D.3d 203, 204-5.

### b.       The Merits—Juror Bias

Petitioner contends that the trial court erred by refusing to discharge Montalvo after learning that her aunt lived in the same building as Petitioner, thus depriving Petitioner of his right to a fair and impartial jury. (Pet. at 9 (Doc. 1).) Petitioner's claim is meritless.

"[D]ue process does not require a new trial every time a juror is placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982) (bias could not be imputed to juror who submitted, during criminal trial, employment application with district attorney's office prosecuting the case). Instead, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Id. "In reviewing claims of [juror bias], the deference due to district courts is at its pinnacle: 'A trial court's findings of juror impartiality may be overturned only for manifest error.'" Skilling, 130 S. Ct. at 2923-24 (no bias imputed to jurors who assured trial court that they could be impartial) (quoting Mu'Min v. Virginia, 500 U.S. 415, 428 (1991)). Finally, as discussed in Part III.B.2.b.

28

supra, under AEDPA, there is a presumption of correctness that attaches to a trial court's determination of juror impartiality. See Fama, 235 F.3d at 813.

Here, like the jurors in Skilling, Montalvo assured the court that she could remain impartial. (Trial Tr. at 82.) She stated that she had not visited her aunt's residence in a number of months, promised she would not go to the building during trial, and unequivocally agreed that she had neither formed an opinion about the case based on her visit to the building, nor mentioned the fact that she had been to 552 West 146th Street to any other juror. (Id.) The court acted well within its discretion in its determination that Montalvo was impartial, and there is no reason not to accord the court's determination its due presumption of correctness under AEDPA. The Appellate Division's conclusion that Montalvo was impartial and that the court properly declined to replace her, see Devison, 38 A.D.3d at 204-05 831 N.Y.S.2d at 65-66, was not an unreasonable application of Supreme Court precedent; therefore, Petitioner's claim is meritless.[9]

---

[9] To the extent Petitioner asserts that the court denied him his right to a fair and impartial jury by improperly refusing to dismiss Montalvo pursuant to C.P.L. § 270.20(1)(c), which provides, in part, that a party may challenge a prospective juror for cause if the "[juror] is related within the sixth degree of consanguinity or affinity to . . . the person allegedly injured by the crime charged, . . . ." (Pet. at 9 (Doc. 1)), that claim fails as well. The Appellate Division concluded that this argument was "unpreserved" and stated that were it to review the claim, it "would find it to be without merit, . . . ." Devison, 38 A.D.3d at 205, 831 N.Y.S.2d at 64. As discussed above, the Second Circuit recognizes New York's contemporaneous objection rule as an "independent and adequate state ground" that procedurally bars habeas review.  See Greene, 497 F.3d at 218.  Furthermore, the Appellate Division's alternative ruling on the merits does not undermine the procedural bar imposed by that court's reliance on Petitioner's procedural default. See Harris, 489 U.S. at 264 n.1; Green, 414 F.3d at 294. There is nothing to suggest that the application of the contemporaneous objection rule to Petitioner in this case is "exorbitant." See Greene, 497 F.3d at 218.  Similarly, Petitioner cannot demonstrate cause for, or actual prejudice resulting from, his failure to preserve his claim. Coleman, 501 U.S. at 749-50. Finally, Petitioner has not demonstrated that a failure to consider his impartial jury claim will result in a miscarriage of justice. Id. Consequently, I conclude that to the extent Petitioner makes this claim, it is procedurally barred.

### C.    Multiple Conspiracies Charge

Petitioner next contends that the trial court erred by not giving a multiple conspiracies charge to the jury.  (Pet. at 9 (Doc. 1).)  At different times, Petitioner has proposed two different theories related to the conspiracy charge.  The Petitioner has asserted, first, that the drug-selling operations operating within 550 and 552 West 146th Street, those headed by Hernandez and Pena, were independent conspiracies.  Second, he has contended that there were additional drug-selling operations on the same block that were independent of both Hernandez and Pena's operations.  Petitioner's first claim is procedurally barred and his second claim is meritless.

### 1.    Multiple Conspiracies Within 550 and 552 West 146th Street

### a.    Independent and Adequate State Law Grounds

To the extent that Petitioner asserts that the trial court erred by not giving the jury a multiple conspiracies charge based on the theory that the conspiracies in 550 and 552 West 146th Street were separate, Petitioner's claim is procedurally barred.  On direct appeal, Petitioner argued that multiple conspiracies were at work in 550 and 552 West 146th Street:  one conspiracy in 550, and another in 552.  (Litsky Decl. Ex. A, at 68, 70-72 (Doc. 15).)  The Appellate Division rejected this claim as "unpreserved and unavailing . . . ."  Devison, 38 A.D.3d at 206 (citation omitted).  During his and Petitioner's trial, Alfonzo joined Petitioner's request for a multiple conspiracies charge based on the drug-selling activity along the whole block.  (Trial Tr. at 2903.)

On appeal, however, Alfonzo argued, like Petitioner, that the trial court should have given a multiple conspiracies instruction based on the drug-selling activity in the two adjoining buildings.  As the Appellate Division noted, Alfonzo's request at trial "was made on a theory that was not only significantly different from, but was actually contradictory to, the theory [Alfonzo]

now raises on appeal." Alfonso, 35 A.D.3d at 269, 827 N.Y.S.2d at 39.  The Appellate Division

accordingly found the argument that the court should have given the jury a multiple conspiracies

instruction based on the activity in the two buildings unpreserved.  Id.  When the court in

Devison pointed to its reasoning in Alfonso, it necessarily applied this argument to Petitioner's

claim.

        As discussed in Part III.B.1.b. supra, the Second Circuit has consistently recognized New

York's contemporaneous objection rules as an independent and adequate state law procedural

bar.  See Garvey, 485 F.3d at 720; Garcia, 188 F.3d at 79.  Thus, in invoking New York's

preservation rule, the Appellate Division rejected Petitioner's argument on an independent and

adequate state law ground, and this Court is procedurally barred from considering Petitioner's

claim on its merits.  Accordingly, the remaining question is whether the Appellate Division's

application of the rule to the Petitioner's case was reasonable, and not "exorbitant."  See Garvey,

485 F.3d at 718.  As before, this requires an analysis of the Cotto factors.

### i.   Was the alleged violation actually relied on at trial, and would perfect compliance have changed the trial court's decision?

        As an initial matter, it is not helpful to ask whether the trial court actually relied on the

violation, since the violation in question was a failure to raise an issue at trial.  See Cotto, 331

F.3d at 242.  In any event, it is unlikely the trial court would have ruled differently if Petitioner

had raised the issue, since the court, during a discussion with Petitioner's and other defendants'

counsel, rejected the idea of multiple conspiracies within the two buildings.  (Trial Tr. at 2908.)

Thus, the first factor does not suggest that the Appellate Division's application of C.P.L. §

470.05 was exorbitant.

### ii.   Did New York State case law indicate that compliance with the rule was demanded in the present case?

Regarding the second <u>Cotto</u> factor, New York case law indicates that parties must raise issues regarding jury instructions at the time of trial in order for them to be considered on appeal. <u>See, e.g.</u>, <u>People v. Rivera</u>, 72 A.D.3d 576, 577, 900 N.Y.S.2d 31, 33 (1st Dep't 2010) (defendant's failure to request justification charge rendered issues pertaining to such charge unpreserved for appellate review); <u>People v. Green</u>, 49 A.D.3d 1029, 1030, 853 N.Y.S.2d 695 (1st Dep't 2008) (defendant's contention that trial court erroneously failed to give jury additional charge was unpreserved for review because defendant failed to request charge or object to charge as given).

Petitioner did not raise at trial the particular claim he raises here.  Instead, he only argued that a multiple conspiracies charge should be given with respect to the other drug-selling activity on the block.  (Trial Tr. at 2905-11.)  New York case law required compliance with the rule here, and this factor thus does not suggest that the Appellate Division's application of C.P.L. § 470.05 was exorbitant.

### iii.   Would demanding perfect compliance with the contemporaneous objection rule serve a legitimate governmental interest?

Finally, the Second Circuit has recognized that demanding compliance with C.P.L. § 470.05 serves a legitimate governmental interest—"the interest in allowing the trial court to have the first opportunity to rule on and possibly rectify any alleged legal error." <u>Garvey</u>, 485 F.3d at 720.  Indeed, "[t]he basis of § 470.05(2) is that the trial court must be given a fair opportunity to rule on an issue of law before it can be raised on appeal." <u>Id.</u>  Petitioner's counsel gave the trial court no such opportunity here as he never alerted the court to the argument that he subsequently raised on direct appeal.  Thus, the third consideration does not indicate that the Appellate

32

Division's application of C.P.L. § 470.05 was exorbitant.

Consequently, because the Appellate Division's decision was based on a ground independent of any federal question and adequate under firmly established and regularly followed state law, Petitioner's claim is procedurally barred.

**b.     Cause and Prejudice, or Fundamental Miscarriage of Justice**

Petitioner cannot overcome his procedural bar.  He has not identified any "objective factor external to the defense" that impeded his counsel's efforts to request at trial a multiple conspiracies charge based on the organizations within 550 and 552 West 146th Street.  See Murray, 477 U.S. at 488.  Moreover, because Petitioner has not demonstrated cause for his procedural default, the Court need not address the issue of prejudice.  See McCleskey, 499 U.S. at 502.  Finally, Petitioner points to no evidence to suggest that he is actually innocent, so he cannot prove a fundamental miscarriage of justice.  See Murray, 477 U.S. at 495-96.  Consequently, Petitioner is unable to overcome the procedural bar of his claim that the trial court's refusal to provide the jury with a multiple conspiracies charge violated Petitioner's federal constitutional rights.

**2.     Other Conspiracies on the Block**

At trial, Petitioner contended that there were "multiple groups of people who package [drugs] in different ways" in addition to the sellers at 550 and 552 West 146th Street.  (Trial Tr. at 2907.)  Petitioner's counsel was clear that his "argument was not for 550 and 552" but "was to the testimony in this case about drug groups operating out of the entire block" who "packaged drugs differently" than the sellers at 550 and 552 West 146th Street.  (Id. at 2910-11.)  Petitioner argued similarly on direct appeal.  (Litsky Decl. Ex. A, at 68, 72-76 (Doc 15).)  Petitioner appears to contend that if the trial court had given the jury a multiple conspiracies charge based

on the fact that there were several conspiracies up and down the block, Petitioner could have been found to have been working for one of the other conspiracies. The Appellate Division found Petitioner's argument, though preserved, to be unavailing. Devison, 38 A.D.3d at 205, 206, 831 N.Y.S.2d at 64. The Appellate Division's decision in this regard was not an unreasonable application of Supreme Court precedent; Petitioner's claim is thus meritless.

### a.   Clearly Established Federal Law Regarding Jury Instructions

As an initial matter, "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (citation omitted). Where an error in a jury instruction is alleged, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "The question is not whether the trial court gave a faulty instruction, but rather "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. at 147; see also Estelle, 502 U.S. at 72.

In light of these principles, "[the Second Circuit] has repeatedly held that '[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.'" Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)). Moreover, in situations such as the one presented here—where a petitioner claims that he should have received a certain jury instruction at trial—"a finding that

34

the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights." Id.  Consequently, I must determine whether Petitioner was entitled to a multiple conspiracies charge under New York State law.

### b.   Multiple Conspiracies Charges Under New York Law

The New York Court of Appeals has concluded that a multiple conspiracies charge "is required whenever the possibility of more than one conspiracy is supported by a reasonable view of the evidence." People v. Leisner, 535 N.E.2d 647, 652, 538 N.Y.S.2d 517, 522 (1989); accord Llaca v. Duncan, No. 01 Civ. 9367 (DC), 2004 WL 964113, at *29 (S.D.N.Y. May 4, 2004).  In Leisner, appellants, two landlords convicted of conspiracy in the fourth degree based upon their plot to force tenants from their rent-controlled apartments, contended that the trial court committed reversible error by refusing to charge the jury on the possibility of multiple conspiracies and that, at best, the proof at trial established a number of discrete conspiracies, not the single conspiracy alleged in the indictment.  Leisner, 535 N.E.2d at 651, 538 N.Y.S.2d at 522.  The Court of Appeals agreed, reasoning that "there was . . . a reasonable view of the evidence to support appellants' contention that any conspiracy or conspiracies proven were narrower in scope than the single overarching one charged in the indictment." Id.  The court explained that the prosecution's chief witness testified that (1) one of the appellants had nothing to do with the buildings of the other appellant and did not participate in vacating them; (2) there was no agreement between the appellants concerning the relocation of the tenants from their respective buildings; and (3) each of the appellant's actions concerning his own building did not depend on the other appellant's actions. Id. at 650-51, 538 N.Y.S.2d at 523.

Unlike in Leisner, there was no such evidence requiring the need for a multiple

conspiracies jury instruction here.  Indeed, although Petitioner asserts that "there was more than a reasonable view of the evidence that multiple conspiracies were present," (Pet. at 9 (Doc. 1)), he points to no evidence tending to suggest that there were multiple conspiracies regarding the drug dealing on West 146th Street.  To the contrary, the proof adduced at trial strongly suggests Petitioner's membership in a single conspiracy between the organizations at 550 and 552 West 146th Street.  For instance, Tony Perez and Altagracia Ignacio testified to Petitioner's membership in the conspiracy.  (See e.g., Trial Tr. at 1714-19, 2115-17.)  Moreover, as Petitioner's counsel stated at trial, the other alleged drug dealing conspiracies on the block "packaged drugs differently" than the conspiracy at 550 and 552 West 146th Street.  (Id. at 2910-11.)  This statement further suggests that Petitioner was not part of any conspiracy other than the one to which he was tied by the evidence presented at trial.  In short, Petitioner was not entitled to a multiple conspiracies charge under New York law regarding other conspiracies on West 146th Street based on a reasonable view of the evidence.

Since Petitioner can show no state law error, he necessarily cannot show that his right to a fair trial was violated as a matter of federal constitutional law.  See Davis, 270 F.3d at 123.  The Appellate Division's decision did not constitute an unreasonable application of Supreme Court precedent; thus, Petitioner's claim is meritless.

**D.    Ineffective Assistance of Counsel**

Lastly, Petitioner contends that his trial counsel was ineffective because counsel did not move for the trial court to (1) question Rivera regarding his conversation with Detective Canelo, or (2) remove Montalvo after she revealed that her aunt lived in one of the buildings involved in the case.  Respondent contends, on the other hand, that Petitioner's ineffective assistance of

counsel claim is procedurally barred under New York C.P.L. § 440.10(2)(c)[10] and, in any event, are meritless. (Resp.'s Opp'n at 54 (Doc. 16).)  I conclude that although Petitioner's claim is not procedurally barred, it is meritless.

### 1. Petitioner's Claim is not Procedurally Barred

A habeas claim is not procedurally barred unless "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." Harris, 489 U.S. at 263 (quoting Caldwell v. Mississippi, 472 U.S. at 327); accord Coleman, 501 U.S. at 735.  Courts have found a violation of this principle in situations where the reliance on a state law ground was unclear from the last state court opinion.  See e.g., Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000) (state court set forth factual predicate for finding of waiver but did not clearly state its intention to rely upon that state law ground); Reid v. Senkowski, 961 F.2d 374, 377 (2d Cir. 1992) (state court did not clearly and expressly state whether it had examined merits of petitioner's missing witness claim or relied on procedural default).

Although the Second Circuit has consistently recognized Section 440.10(2)(c) to be an independent and adequate bar to federal habeas review, see, e.g., Clark, 510 F.3d at 390-91; Jimenez v. Walker, 458 F.3d 130, 148-49 (2d Cir. 2006), here, the trial court did not expressly state that its judgment rested on § 440.10(2)(c) grounds.  Indeed, in a one sentence order, the trial court stated only that it denied Petitioner's § 440.10 Motion "for the reasons set forth in the People's Response." (See Litsky Decl. Ex. H, at 32 (Doc 15).)

---

[10] New York Criminal Procedure Law § 440.10(2)(c) provides, in part, that a court must deny a § 440.10 motion when sufficient facts appear on the record of the proceedings to have allowed adequate review of an issue on appeal, but the defendant unjustifiably failed to raise the issue on appeal.

Respondent's contention that the trial court "implicitly relied on" the procedural bar argument that Respondent made in its response to Petitioner's § 440.10 motion is unavailing. (Resp.'s Opp'n at 56 (Doc. 16).)  Although in that response Respondent appears to argue, without mentioning § 440.10(2)(c), that Petitioner's claim was procedurally barred, (see Litsky Decl. Ex. H, at 80 ¶ 16 (Doc. 15) (stating that the alleged errors in question do not rise to the level of constitutional violation "because the issues in question are contained squarely within the four corners of the trial record and available for appeal")), he also appears to contend that Petitioner's claim was meritless (see id. at 80 ¶ 17 ("[S]uch claims do not implicate Constitutional violations where the defendant had counsel at trial, the opportunity and means to object and chance for appeal.") (citation omitted))).  Consequently, I cannot conclude that the trial court's adoption of Respondent's argument constitutes a clear and express statement that its judgment rested upon a procedural bar. See Reid, 961 F.2d at 377.  I must therefore consider the merits of Petitioner's claim.

### 2. The Merits—Ineffective Assistance of Counsel

"[T]he Strickland standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Aparicio v. Artuz, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)); accord Knowles, 129 S. Ct. at 1420.  Under Strickland, a petitioner seeking to have his conviction reversed due to ineffective assistance of counsel must prove that (1) counsel's performance was deficient; and (2) this deficiency prejudiced the petitioner. Knowles, 129 S. Ct. at 1420 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

To establish deficient performance, Petitioner must show "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88.  "The proper

measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Thus, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690. This deference is particularly warranted when considering matters of trial strategy—an area that reviewing courts are "ill-suited to second-guess." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). Moreover, "[f]ailure to make a meritless argument does not amount to ineffective assistance." U.S. v. Regalado, 518 F.3d 143, 149 n.3 (2d Cir. 2008) (quoting United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999) (citations omitted)); accord United States v. Javino, 960 F.2d 1137, 1145 (2d Cir. 1992) (counsel's failure to request certain jury instructions did not amount to deficient performance because court's instructions were correct as given).

"To establish prejudice, '[Petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The Supreme Court has emphasized, moreover, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Regarding deficiency, Petitioner contends that his counsel's failure to make motions for the trial court to question Rivera and remove Montalvo constitute ineffective assistance. As discussed above in Parts III.B.1.a. and III.B.3.a. supra, both of these arguments would have been meritless as the trial court, exercising its broad discretion in determining juror impartiality, had already refused the requests of codefendant Carlos's counsel to question Rivera and, later, to

remove Montalvo. Failure to make meritless arguments does not amount to ineffective assistance. Regalado, 518 F.3d at 149 n.3. Additionally, there is nothing to suggest that Petitioner's counsel's decisions not to make the arguments were not "virtually unchallengeable" strategic decisions made with knowledge of the law and facts relevant to plausible options. See Strickland, 466 U.S. at 690. Indeed, the fact that the trial court had already refused the requests of Petitioner's co-defendant's counsel to question Rivera and remove Montalvo suggests that Petitioner's counsel had no plausible options.

Moreover, viewing the record as a whole, Petitioner's counsel vigorously and competently defended Petitioner at trial. See Miller v. People of New York, No. 05 Civ. 5754 (LTS) (DCF), 2009 WL 5061746, at *10 (S.D.N.Y. Dec. 23, 2009) (viewing record as whole can demonstrate that trial counsel provided competent representation) (citation omitted); Roberts v. Payant, No. 05 Civ. 3110 (RJH) (DF), 2009 WL 6412017, at *14 (S.D.N.Y. Dec. 3, 2009) (same). Petitioner's counsel delivered an opening statement in which he reminded the jury of the burden of proof and the presumption of innocence. (Trial Tr. 62-63.) He cross-examined witnesses and made objections that the trial court sustained. (See e.g., id. at 1063, 2075.) At the end of the people's case, moreover, he moved for an order of dismissal. (Id. at 2825-26.) Finally, when the trial court denied that motion, counsel delivered a summation in which he advanced the arguments that he had developed during the course of the trial (Trial Tr. at 2948-99.) As a result of these efforts, the jury acquitted Petitioner of the top count of Conspiracy in the First Degree. (Id. at 3507.) On this record, I cannot conclude that counsel's performance was objectively unreasonable. See Miller, 2009 WL 5061746, at *10.

Even though the prejudice prong of Strickland need not be addressed, see Strickland, 466 U.S. at 697, I note that Petitioner has not demonstrated that he suffered prejudice from his

counsel's performance.  To prevail on his ineffective assistance claim, Petitioner must show that there was a "reasonable probability" that with a newly constituted jury that did not include Montalvo or Rivera, his trial would have turned out differently.  See Knowles, 129 S. Ct. at 1422 This Petitioner cannot do.  Indeed, the newly constituted jury would have seen the extensive evidence inculpating Petitioner as outlined above.  See Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001) ("Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt.").

On this record, the trial court's rejection of Petitioner's ineffective assistance of counsel claim was not an unreasonable application of federal law, as enunciated by the Supreme Court in Strickland; accordingly, Petitioner's application for habeas relief on the grounds of ineffective assistance of counsel should be denied, under AEDPA. 28 U.S.C. § 2254(d).

### IV.   CONCLUSION

For the foregoing reasons, I recommend that Petitioner's petition for habeas corpus be DENIED in its entirety.  Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has failed to make "a substantial showing of the denial of a constitutional right."  Id. § 2253(c)(2).

### PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007.  Any requests for an extension of time for filing

objections must be directed to Judge Batts.  **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See Thomas v. Am, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  If Petitioner does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Respondent's counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Dated: New York, New York
      October 14, 2010

JAMES L. COTT
United States Magistrate Judge

Copies mailed to:

Miguel Devison
04-A-3713
Woodbourne Correctional Facility
99 Prison Rd.
P.O. Box 1000
Woodbourne, N.Y. 12788

Lisa Fleischmann
Thomas B. Litsky
Assistant Attorneys General
120 Broadway
New York, NY 12788

42